Brian S. King, #4610
**BRIAN S. KING PC**
336 South 300 East, Suite 200
Salt Lake City, Utah 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOEL S., ROBIN S., and SYDNEY S.<br>  Plaintiff,<br><br>vs.<br><br>CIGNA, CIGNA BEHAVIORAL HEALTH, and the NEW ORLEANS – BATON ROUGE STEAMSHIP PILOTS MEDICAL BENEFITS PLAN,<br><br>  Defendants. | COMPLAINT<br><br><br>Civil No. 1:16-cv-00143 CW |

Plaintiffs Joel S. ("Joel"), Robin S. ("Robin"), and Sydney S. ("Sydney") (collectively "Plaintiffs" or "S. Family"), through their undersigned counsel, complain and allege against Defendants Cigna ("Cigna"), Cigna Behavioral Health ("CBH"), and the New Orleans-Baton Rouge Steamship Pilots Medical Benefits Plan ("the Plan") as follows:

### PARTIES, JURISDICTION & VENUE

1. Plaintiffs are natural persons residing in St. Charles Parish, State of Louisiana. Joel and Robin are Sydney's parents.

2. Cigna is an insurance company licensed to do business across the United States.

3. The Plan is a self funded group health plan sponsored by New Orleans – Baton Rouge Steamship Pilots for its employees and their dependents. The Plan is an employee welfare

benefits plan under 29 U.S.C. §1001 *et. seq.,* the Employee Retirement Income Security Act of 1974 ("ERISA").

4. Joel is a participant of the Plan and Robin and Sydney are beneficiaries of the Plan.

5. CBH is a national corporation with its corporate headquarters in the State of Minnesota. CBH does business throughout the United States and is the mental health claims administrator for the Plan.

6. Sydney received medical care for her mental health conditions at Menninger Clinic ("Menninger") in Houston, Texas, and at Solstice Residential Treatment Center ("Solstice") in Layton, Utah.

7. CBH, acting as agent for the Plan, denied Sydney's claims for payment of her medical expenses in connection with her treatment at Menninger and Solstice.

8. This Court has jurisdiction over this matter under 29 U.S.C. §1132(e)(1) and 29 U.S.C.§ 1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) because the medical treatment at issue in this case was provided in the State of Utah, and the Defendants do business in the State of Utah. Based on ERISA's nationwide service of process provision and 28 U.S.C. § 1391, venue is appropriate in the State of Utah.

10. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for an Order that the Defendants must pay the benefits due pursuant to 29 U.S.C. § 1132(a)(1)(B), for an award of pre-judgment interest pursuant to U.C.P. §15-1-1, and for an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## FACTUAL BACKGROUND

### Sydney's Medical History and Treatment

11. Sydney exhibited problematic mental health behavioral symptoms from an early age.

12. Sydney was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") when she was in fifth grade.

13. Beginning in elementary school, Sydney reported auditory hallucinations/hearing voices, depression, and anxiety.

14. In October of 2011, Sydney was on a school trip. While on the bus, Sydney wrapped a scarf around her neck and mimicked a hanging motion. Several students took photos of her during the occurrence.

15. In December of 2011, the students who took the photos of Sydney with a scarf around her neck like a noose were suspended from school. Sydney experienced increased depression, anxiety, and isolation after the suspension of the other students. Sydney also began demonstrating symptoms of an eating disorder and began self-harming.

16. Sydney has been prescribed a number of medications including, but not limited to, Wellbutrin and Trazodone.

17. Sydney began experiencing difficulties in school and was placed on academic suspension in 9th grade.

18. In June of 2012, Sydney suffered a knee injury that required surgery. Due to the knee injury, Sydney began to socially isolate, gained weight, and began struggling with interpersonal relationships.

19. Sydney has consistently attended structured schooling, and began attending boarding school in January of 2013.

20. While at the boarding school, Sydney experienced a significant decrease in socialization, began having problems with peers in the school, experienced significant body dissatisfaction, and began self-harming by scratching herself.

21. On September 30, 2013, Sydney attempted suicide by taking an undisclosed number of Trazadone pills. Her suite-mate at the boarding school discovered her attempt and notified the school. The principal of the boarding school later found Sydney's suicide note.

22. Sydney was admitted to Menninger on October 2, 2013, after her attempted suicide of September 30, 2013.

23. Sydney was admitted to Menninger for assessment, diagnosis, and appropriate ongoing treatment.

24. A psychiatric evaluation was completed upon Sydney's admission to Menninger, and she was diagnosed as follows:

| | | |
|---|---|---|
| AXIS I | 296.32 | Major Depressive Disorder, Recurrent, Moderate |
| | 300.4 | Dysthymic Disorder |
| | 300.00 | Anxiety Disorder, NOS |
| | r/o 307.50 | Eating Disorder, NOS |
| | r/o 314.01 | Attention-Deficit/Hyperactivity Disorder, Combined Type |
| AXIS II | | Cluster B Traits |
| AXIS III | | -Recent overdose on Trazodone |
| | | - knee injury, status post surgical correction |
| AXIS IV | | Parent-Child Relational Problem |
| | | Academic Problem |
| | | Peer Relational Problems |
| AXIS V | | Current G.A.F.: 40[1] |

25. Sydney was evaluated and treated at Menninger for approximately 30 days. She was discharged on November 1, 2013.

---

[1] G.A.F., or global assessment of functioning, was developed as a tool for mental healthcare providers to assess the overall level of functioning and ability to carry out activities of daily living for their patients. There is a separate scale utilized when the patient is a child or adolescent. A GAF of 40 on the child's global assessment scale indicates "Major impairment in functioning in several areas and unable to function in one of these areas, i.e., disturbed at home, at school, with peers, or in the society at large, e.g., persistent aggression without clear instigation; markedly withdrawn and isolated behavior due to either mood or thought disturbance, suicidal attempts with clear lethal intent. Such children are likely to require special schooling and/or hospitalization or withdrawal from school (but this is not a sufficient criterion for inclusion in this category)." D. Shaffer, M.S. Gould, H. Bird, and P. Fisher Modified from: Rush J, et al: Psychiatric Measures, APA, Washington DC, 2000.

26. Sydney continued to require 24-hour inpatient care, and upon discharge from Menninger, was scheduled to be admitted to Solstice on November 4, 2013.

27. Sydney was formally admitted at Solstice on November 5, 2013. Solstice provides mental health residential treatment for adolescent girls.

28. Shortly after Sydney's admission to Solstice, on November 15, 2013, an Intake Assessment was conducted and Sydney's diagnosis was as follows:

| | | |
|---|---|---|
| AXIS I | 266.32 | Major Depressive Disorder, Recurrent, Moderate, with psychotic features in the past |
| | 300.02 | Generalized Anxiety Disorder |
| | V-61.20 | Parent-Child Relational Problem |
| | 305.20 | Cannabis Abuse |
| | 305.00 | Alcohol Abuse |
| | 314.01 | History of ADHD Combined Type |
| AXIS II | | Borderline Traits noted |
| AXIS III | | Knee surgery about two years ago |
| AXIS IV | | Family Issues |
| | | Academic Problems |
| | | Knee Problems |
| | | Relationship Issues |
| AXIS V | | Current GAF: 45 |
| | | Highest Past Year: 50 |

29. Sydney's treatment at Solstice included, but was not limited to, individual therapy sessions, group therapy sessions, and family therapy sessions.

30. Sydney experienced several regressions during treatment and she struggled throughout her admission, but remained committed to her program.

31. Sydney was discharged early from Solstice on May 30, 2014 due to financial constraints.

## THE CLAIMS AND APPEAL PROCESS

### Menninger

32. Following Sydney's treatment at Menninger, claims were submitted to Cigna for her treatment from October 11, 2013 through November 1, 2013. On February 20, 2014, CBH

5

wrote to Sydney and stated that Sydney did not qualify for the requested services based on Cigna's Medical Necessity Criteria for continued stay at Acute Inpatient Mental Health Treatment for Children and Adolescents level of care. CBH asserted, "Appropriate and timely treatment was available at a less restrictive level of care. Therefore the initial determination is upheld."

33. Robin requested an External Review of CBH's determination in an appeal letter dated April 21, 2014.

34. Robin argued that the reviewing physician, Dr. Blank, did not specifically state which of the Continued Stay Criteria was unmet. Robin also argued that the denial reasons indicated that Dr. Blank did not fully review the medical records that had previously been supplied.

35. Robin argued that the medical records provided clear and convincing proof that Sydney's treatment at Menninger was medically necessary from October 11, 2013 through November 1, 2013.

36. Robin pointed out that CBH clearly believed Sydney met the criteria, as they approved the first eight days of her treatment at Menninger, from October 2, 2013 through October 10, 2013.

37. Robin argued that there were no references to specific medical records supporting the determination made by CBH that Sydney failed to meet Acute Inpatient requirements.

38. Robin asked that CBH respond to the issues raised in her administrative appeal.

39. Robin's external review request letter was eighteen (18) pages long and was supported by exhibits including, but not limited to, a letter of medical necessity for Sydney's treatment at Menninger from Dr. Paul G. Pelts, M.D. dated April 3, 2014 and medical records from Menninger.

40. CBH upheld its denial in a two page letter dated May 13, 2014. The denial letter stated in part:

> MCMC completed this external review on 05/12/2014. The determination upheld our previous reviews of this issue, as the services do not meet Cigna Behavioral Health Medical Necessity Criteria for Acute Inpatient Mental Health Treatment for Children and Adolescents. The clinical rationale is as follows:
>
> The patient is a 16 year old female who is diagnosed with attention deficity *[sic]* hyperactivity disorder (ADHD), major depressive disorder (MDD), and anxiety disorder not otherwise specified (NOS). She was admitted to inpatient (IP) Mental Health care on 10/02/2013 following an overdose (OD) with Trazodone. The patient had taken the OD in a suicide attempt while at boarding school. She told her roommate, and the patient was taken by ambulance to the ER. She was observed overnight and transferred to psychiatry once medically cleared. Her outpatient medications (OP) include birth control pills (BCPs), Focalin, Vyvanse, Trazodone, Melatonin, and Fioricet prn (as needed) for migraines. She reports hearing voices for years and "seeing" a man. She has alcohol every few weeks and marijuana occasionally. She underwent knee surgery and is unable to be as active as she used to be, which causes some insecurity and self-hatred. She is diagnosed with depression and borderline personality traits. Discharge plan is possible transfer to residential treatment center (RTC).
>
> As of 10/11/2013 there is not a high likelihood that the patient is about to cause serious bodily harm to self or others due to a psychiatric illness; it is not very likely that serious harm will come to the patient due to a psychiatric illness, or that harm cannot be prevented at a lower level of care; the patient does not have a secondary condition such that treatment cannot be provided at a less restrictive level of care, and less restrictive levels of care are available for safe and effective treatment. As such, the requested acute inpatient (IP) stay from 10/11/2013 – 11/01/2013 is not medically necessary.

41. Robin exhausted the internal appeals processed required under ERISA for Sydney's medical treatment at Menninger.

## Solstice

42. After Sydney's admission at Solstice, claims were submitted to CBH for payment of Sydney's medical expenses.

43. CBH denied coverage in a letter dated February 06, 2014. The denial letter stated in part:

> …We received a coverage request on 01/14/2014 for Sydney [S.] for the following service/procedure(s): Residential Mental Health Treatment for Children and Adolescents rendered by Solstice RTC. After a review of the information submitted by your provider and the terms of your benefit plan, Cigna's Peer Reviewer, Mohsin Qayyum, M.D., (CA: A72429), a board certified psychiatrist, has determined that the requested services are not covered. This decision was based on the following:
>
> - The clinical basis for this decision is: Based upon the available clinical information, your symptoms did not meet medical necessity criteria of Cigna Level of Care Guidelines for Residential Mental Health Treatment for Children and Adolescents level of care from 11/05/2013 – 07/09/2014. You did not have a severe psychiatric disorder that was pervasive and resulting in significant impairment multiple settings and clearly demonstrates a need for 24-hour supervision and active treatment. Less restrictive or intensive levels of treatment were appropriate and available.

44. Robin appealed CBH's decision in an appeal letter dated January 30, 2015.

45. In her appeal, Robin argued that Sydney's treatment was medically necessary due to her dual diagnosis of multiple mental health conditions and a substance abuse disorder.

46. Robin argued that the dual diagnosis was not referred to in the denial, and that CBH failed to include substance abuse criteria in their review of Sydney's mental health treatment claims.

47. Robin also provided a detailed behavioral history for Sydney, supported by medical records and clinical documentation, including but not limited to, a letter of medical necessity for Sydney's treatment at Solstice from Dr. Paul G. Pelts, M.D. dated April 3, 2014.

48. In connection with the medical records and clinical documentation, Robin asked CBH which specific records were reviewed in the determination process.

49. Robin again argued that lower levels of care were continually tried without benefit, and the residential treatment was medically necessary.

50. Robin asked for specific references to Sydney's clinical and medical records that CBH was relying on to justify its denial, as well as asked what symptoms Sydney would have to have to allow CBH to authorize her mental health treatment as medically necessary.

51. Robin also asked CBH for the number of residential treatment claims denied by Dr. Qayyum during the prior three years.

52. CBH upheld their denial in a letter dated March 5, 2015. The denial letter stated in part:

 …After a review of the information submitted and the terms of your benefit plan, we have decided to uphold the original decision not to authorize the requested services. Cigna's Peer Reviewer, Frederick Green, M.D. (AZ: 19095) a board certified psychiatrist, has determined that the requested services are not covered. This decision was based on the following:

 - The clinical basis for this decision is: Based upon the available clinical information received initially and with this appeal, your symptoms did not meet Cigna Behavioral Health Medical Necessity Criteria for admission and continued stay at Residential Mental Health Treatment for Children and Adolescents level of care from 11/05/2013 – 05/30/2014 as following immediate prior treatment in a more intensive level of care, you did not continue to display behaviors that required around-the-clock supervision in a structured setting in order to maintain the safety of yourself or others. The information provided was that you engaged well in therapy and showed an understanding of the concepts. As the notation was that after more than 6 months, the facility considered it to be an "early discharge", clearly there was a long-term stay in a stable living situation being considered as a major component of the stay. In the absence of a focused new intervention proposed that required around-the-clock supervision, there is nothing suggesting that while living in a supportive setting you could not use outpatient psychotherapy appropriately. Less restrictive or intensive levels of treatment were appropriate and available.

53. CBH did not respond to Robin's request for information about the number of residential treatment claims denied by Dr. Qayyum.

54. Robin appealed the denial in a letter requesting an independent external review, dated April 30, 2015.

55. In her appeal, Robin included the prior appeal correspondence dated January 30, 2015, as well as supporting documents.

56. CBH failed to respond to Robin's request for an independent external review of Sydney's mental health treatment claims.

57. CBH has failed to respond to the direct requests Robin presented in each of her appeals, including but not limited to, questions about what symptoms Sydney needed to exhibit in order for her treatment to be considered medically necessary, what symptoms were missing, and what specific medical and clinical records CBH was using to make its determination.

58. CBH failed to engage in meaningful dialogue with Robin.

59. Robin exhausted the internal appeal process required by ERISA.

## CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

60. ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon plan fiduciaries such as CBH to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

61. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1133(2).

62. CBH breached its fiduciary duties to Sydney when it failed to comply with its obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in her interest and for the exclusive purpose of providing benefits to her, and to provide a full and fair review of her claims.

63. The actions of CBH in failing to provide coverage for Sydney's medically necessary treatment at Menninger and Solstice are a violation of the terms of ERISA, the Plan, and CBH's medical necessity criteria.

64. The actions of CBH in failing to respond to the external appeal of the Solstice denials is a violation of ERISA and its claims processing regulations and indicates an arbitrary and capricious decision-making process.

65. The actions of CBH, as outlined above, have caused damage to the Plaintiffs in the form of denial of payment for medical services rendered to Sydney in an amount exceeding $124,000.

66. CBH is responsible to pay Sydney's medical expenses as benefits due under the terms of the Plan, together with prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g).

   WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for Sydney's medically necessary treatment under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

   DATED this 29th day of September, 2016.

                                                                               /s/ Brian S. King
                                                                               Brian S. King
                                                                               Attorney for Plaintiffs

Plaintiffs' Address:
St. Charles Parish, Louisiana