IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| Joel S. et al.,<br><br>                     Plaintiffs,<br><br>v.<br><br>Cigna et al.,<br><br>                     Defendants. | **MEMORANDUM DECISION & ORDER**<br><br><br>Case No. 1:16-cv-143-CW<br><br>District Judge Clark Waddoups |

Before the court is Plaintiffs the S Family's Motion for Summary Judgment of this

ERISA action. (ECF No. 27.) The S Family contends that Cigna improperly denied coverage for

two different periods of S.S.'s psychiatric treatment. Defendants respond that this court owes

deference to Cigna and that the denials were within Cigna's discretion. The court heard oral

argument on the motion on May 24, 2018. Having fully considered the briefing, hearing oral

argument, and being otherwise fully informed, the court DENIES the S Family's Motion for the

reasons stated herein.

### BACKGROUND[1]

This action involves Cigna's denial of insurance coverage for the psychiatric treatment of

S.S., a minor. During the relevant time, New Orleans-Baton Rouge Steamship Pilots Association

Plan ("the Plan"), a self-funded plan that Cigna administered, insured S.S.'s father, Joel S., and

his dependents. (Motion 3, ECF No. 27.) The Plan provides coverage for healthcare services

---

[1] The court's review is limited to the prelitigation appeal record, *Jewell v. Life Ins. Co. of N. Amer.*, 508 F.3d 1303, 1308 (10th Cir. 2007), which the parties agree is complete. (Response Brief 4, ECF No. 30.)

deemed "medically necessary," as defined in the Plan. (*Id.*) Cigna has discretion to administer the Plan, including making coverage decisions. (*Id.*) The Plan also provides for claimants to seek independent review from a Plan designated Independent Review Organization (IRO) if Cigna denies both the claim and the appeal. (Sealed Record 42.)

At the age of sixteen, S.S.'s outpatient treating physician referred her to Menninger Clinic for acute inpatient psychiatric hospitalization after a suicide attempt. (*Id.* at 9.) She had previously been in outpatient therapy for depression, anxiety, and ADHD. (*Id.* at 7–8.) S.S. was treated at Menninger from October 2, 2013 to November 1, 2013. (*Id.* at 9, 12.) She then went to Solstice Residential Treatment Facility, where she received residential treatment from November 5, 2013 to May 30, 2014. (*Id.* at 11.) Cigna covered S.S.'s treatment at Menninger from October 2 to October 10, but it denied coverage for the remainder of her treatment, including her entire stay at Solstice, as not medically necessary. (*Id.* at 319 & 724.) S.S., through her parents, unsuccessfully internally appealed Cigna's denials and sought review from an independent reviewer. (Motion 12–18, ECF No. 27; Sealed Record 278 & 682.) The independent reviewer, MCMC, concluded the treatment was not medically necessary, so Cigna again denied coverage. (Motion 17–18, ECF No. 27.)

The S Family now seeks this court's review. It first asserts that the court should review the claim denials de novo because Cigna violated its fiduciary obligations under the Plan by failing to follow claim procedures set out in the ERISA regulations. (Motion 18–27, ECF No. 27.) It next contends that Cigna improperly decided its claims and that the Plan entitles it to compensation for the entirety of S.S.'s time at Menninger and Solstice. (*Id.* 28–39.) Finally, the

S Family argues it is entitled to recover prejudgment interest on the amount of recovery and to attorney fees and costs associated with this litigation. (*Id.* 39–45.)

ANALYSIS

### I.    *Standard of Review*

Relying on trust principles, the Supreme Court announced in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989), that the court in an ERISA action is to review the denial of benefits "under a *de novo* standard, unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *id.* at 115. "If the plan does explicitly confer discretionary authority on an administrator with so-called *Firestone* language," the court "must review benefit determinations under an 'arbitrary and capricious' standard." *Geddes v. United Staffing All. Emp. Med. Plan, U.S.A.*, 469 F.3d 919, 923 (10th Cir. 2006).

Here, the Plan confers "discretionary authority" on Cigna, acting as the Plan Administrator, "to determine eligibility and to interpret the Plan." (Sealed Record 6.) Cigna has "the discretionary authority to determine whether a claim should be paid or denied on appeal and according to the Plan provisions." (*Id.*) And the parties agree that, given this discretion, ordinarily the court would conduct an arbitrary and capricious review, asking whether the coverage denials are supported by substantial evidence.[2] *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 801 (10th Cir. 2004) (citing *Firestone*, 489 U.S. at 115).

---

[2] The Plan also creates a right to seek outside review from an IRO whose decision is final and binding. The parties dispute whether the court should defer to MCMC's decision. (*Compare* Response 19–10, ECF No. 30, *with* Reply 9–10, ECF No. 34.) The Plan creates the right to appeal to an IRO, the S Family chose to avail itself of MCMC's review, and now the S Family claims MCMC is entitled to no deference. But its "argument on this point would have the drastic

But the S Family argues that Cigna's review process was marked by various procedural irregularities and, relying upon the Second Circuit Court of Appeals analysis in *Halo v. Yale Health Plan*, 819 F.3d 42 (2d Cir. 2016), that the appropriate standard of review is therefore de novo. In *Halo*, the Second Circuit concluded that under established trust principles a trustee is not entitled to deference if it fails to uphold the applicable standard of care, which the Court determined was defined by the ERISA regulations set out in 29 C.F.R. § 250.503-1 as amended in 2002. 819 F.3d at 52. Therefore, the court looked to the 2002 ERISA regulations and the accompanying Preamble, which states that de novo review applies if the Plan administrator violates the regulations no matter how minor or substantial the violation, and concluded that because § 250.503-1(l) ("Subsection (l)") of the regulations is ambiguous, the Preamble's interpretation of Subsection (l) merits *Auer* deference. *Id.* at 53–54. In light of the Preamble, the *Halo* court concluded that failure to comply with any part of the regulations triggers de novo review, except when the administrator can show that the irregularities were inadvertent and harmless. *Id.* at 53–54, 58.

The Tenth Circuit addressed the impact of procedural irregularities on judicial review in *Gilbertson v. Allied Signal Inc.*, 328 F.3d 625 (10th Cir. 2003). In *Gilbertson*, the Tenth Circuit applied the 1977 version of the ERISA regulations and concluded that, when a plan administrator fails to exercise its discretion by, for example, failing to render a timely decision, the claim is

---

effect of virtually eliminating the potential for *Firestone* deference anywhere in the United States because the Affordable Care Act now mandates an IRO review process for all health plans offered in the United States. . . . [T]he better view is that an IRO determination strengthens, not weakens, the case for discretionary review." *Lyn M. v. Premera Blue Cross*, 2:17-cv-1152, 2018 WL 2336115, at *6 (D. Utah May 23, 2018), *appeal docketed*, No. 18-4098 (10th Cir. June 25, 2018).

deemed denied and the district court owes no deference to the administrator. *Id.* at 630–31. But the court went on to explain that a plan administrator may be spared this rigorous standard if it substantially complied with the regulations. *Id.* at 634–35. The Tenth Circuit has not decided whether the promulgation of the 2002 ERISA regulations affects its substantial compliance analysis under *Gilbertson*.[3] Instead, the Court has repeatedly reserved that issue. *See, e.g.*, *Hancock v. Metro. Life Ins.*, 590 F.3d 1141, 1152 n.3 (10th Cir. 2009) ("Because Ms. Hancock has failed to show any noncompliance, we need not consider whether substantial compliance is sufficient under the January 2002 revisions of ERISA."); *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins.*, 605 F.3d 789, 800 (10th Cir. 2010) ("We need not decide whether that 'substantial compliance' doctrine still applies to . . . 29 C.F.R. § 2560.503-1, because even assuming it does apply, MetLife did not substantially comply here with ERISA's requirement of a timely resolution of an administrative appeal."). Therefore, this court must determine the effect a procedural irregularity should have under the new regulations, including whether to follow *Halo*. To decide this, the court first looks to the regulations.

In the 2002 ERISA regulations, which govern this case, the Department of Labor passed the following rule:

> (l) Failure to establish and follow reasonable claims procedures. In the case of the failure of a plan to establish or follow claims

---

[3] In *M.K. v Visa Cigna Network POS Plan*, 628 Fed. Appx. 585 (10th Cir. 2015) (unpublished), the Tenth Circuit applied the substantial compliance exception to a claim filed in 2012 without comment on the effect of the updated regulatory scheme on the application of substantial compliance, *id.* at 591. While *M.K.* is persuasive authority in support of this court's conclusion about the standard of review, the court does not conclusively rely on *M.K.* because it is unpublished and lacks precedential value. *See* 10th Cir. R. 32.1.

procedures consistent with the requirements of this section, a
claimant shall be deemed to have exhausted the administrative
remedies available under the plan and shall be entitled to pursue
any available remedies under section 502(a) of the Act on the basis
that the plan has failed to provide a reasonable claims procedure
that would yield a decision on the merits of the claim.

29 C.F.R. § 250.503-1(l). Although Subsection (l) is silent on the issue of standard of review, the

Preamble explains that "[t]he Department's intentions in including this provision in the proposal

were to clarify that the procedural minimums of the regulation are essential to procedural

fairness and that a decision made in the absence of the mandated procedural protections should

not be entitled to any judicial deference." Employee Retirement Income Security Act of 1974;

Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg.

70,246, 70,255 (November 21, 2000) (codified at 29 C.F.R. § 250.503-1). Although many

commenters advocated "a standard of good faith compliance as the measure for requiring

administrative exhaustion, . . . the Department . . . determined to retain" the provision as

proposed. *Id.* at 70,255–56.

The *Halo* court concluded that the Department of Labor's interpretation set forth in the

Preamble merits deference under *Auer v. Robbins*, 519 U.S. 452 (1997), because it concluded

that the language of Subsection (l) is ambiguous. *Halo*, 819 F.3d at 53. The court acknowledged

that "Subsection (*l*) . . . says nothing about standards of review;" nevertheless, it concluded an

ambiguity exists because Subsection (l) "could be reasonably read as incorporating the logic of

*Firestone* and its progeny that a claim is subject to *de novo* review if it is 'deemed denied,' the

effective equivalent of being deemed exhausted under the 2000 regulation." *Id.* at 54. *Halo*

further concluded that the substantial compliance doctrine "is flatly inconsistent with the 2000

regulation" because the Preamble indicates that the Department of Labor considered and rejected

such an exception when it adopted the new regulations. *Id.* Nevertheless, the court concluded it was necessary, "[t]o prevent the exception from swallowing the rule," to allow the plan administrator to demonstrate it had "established procedures in full conformity with the regulation and . . . show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless." *Id.* at 58 (emphasis in original). In which case, the plan would receive deference.

But under Tenth Circuit precedent, this court owes the Preamble no deference. Subsection (l) does not address the question of standard of review, and the Second Circuit's finding that *Auer* governed depends upon a finding of ambiguity that is inconsistent with the Tenth Circuit's guidance on regulatory interpretation. *Auer* requires the court to defer to an agency's interpretation of its own regulation unless the interpretation is "'plainly erroneous or inconsistent with the regulation.'" *Auer*, 519 U.S. at 461 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). But "*Auer* deference is warranted only when the language of the regulation is ambiguous." *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000). As the Tenth Circuit said in *Mitchell v. Commissioner of Internal Revenue*,

> In interpreting the relevant regulations, we apply the same rules we use to interpret statutes. We begin by examining the plain language of the text, giving each word its ordinary and customary meaning. If, after engaging in this textual analysis, the meaning of the regulations is clear, our analysis is at an end, and we must enforce the regulations in accordance with their plain meaning.

775 F.3d 1243, 1249 (10th Cir. 2015) (internal citations omitted). Only if "the meaning of the regulations is not plain," will the court "defer to [the agency's] reasonable interpretations" that are neither "'plainly erroneous [n]or inconsistent with the regulations.'" *Id.* (quoting *Chase Bank USA , N.A. v. McCoy*, 562 U.S. 195, 208 (2011)). This process is necessary because deference to

an agency interpretation of an unambiguous regulation "would . . . permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation" without going through notice and comment. *Christensen*, 529 U.S. at 588.

"A regulation is 'ambiguous if it is reasonably susceptible to more than one interpretation or capable of being understood in two or more possible senses or ways.'" *Jake's Fireworks Inc. v. Acosta*, 893 F.3d 1248, 1261 (10th Cir. 2018). The regulation here is susceptible to only one meaning: when the plan or its administrator fails to provide for or follow its own procedures in compliance with the regulations, the claim is exhausted, allowing the claimant to seek judicial review or any other available remedy. *See Kohut v. Hartford Life and Acc. Ins. Co.*, 710 F.Supp.2d 1139, 1145 (D. Colo. 2008) ("The regulation does *not* purport to state a standard of review under which such an action will be governed. Accordingly, because [Subsection (l)] is not ambiguous on the question of the proper standard of review that applies in this case—indeed, the regulation does not speak to this issue at all—the agency's explanatory language on this point is entitled to no judicial deference."). Subsection (l) simply provides a route to judicial review when the plan fails to comply with ERISA and its regulations.

While the question of what standard of review the district court should apply may remain, silence on a matter about which interested parties may be curious is not in and of itself an ambiguity. *See Boxell v. Plan for Group Ins. Of Verizon Commc'ns, Inc.*, Case No. 1:13-cv-89, 2013 WL 5230240, at *3 (N.D. Ind. Sept. 16, 2013) ("The regulation does *not* allude to a second consequence and to interpret otherwise is not a permissible construction of the regulation."); *Goldman v. Hartford Life and Accident Ins. Co.*, 417 F. Supp. 2d 788, 804 (E.D. La. 2006) ("Unlike *Auer*, however, this case does not involve ambiguity in the terms of a regulation.

Rather, the amended [Subsection (l)] simply does not speak to the issue of the standard of review, and, accordingly *Auer* does not require deference to the Department's position in this case.").  Rather, it appears the agency omitted a potentially controversial policy from the proposed rule, then set forth that policy in the Preamble without notice and comment. *See Christensen*, 529 U.S. at 588; *see also Seger v. Reliastar Life*, No. 3:04-cv-16, 2005 WL 2249905, at *8–*9 (N.D. Fla. Sept. 14, 2005) (concluding that court did not owe *Chevron* deference to the Preamble because the agency exceeded the scope of its mandate in seeking to "bootstrap itself into" regulating judicial power, "an area in which it has no jurisdiction"). Because Subsection (l) is not ambiguous, the court owes no deference to the Preamble[4] and does not apply *Halo*.[5] Having reached this conclusion, the court must now determine what standard of review applies under existing Tenth Circuit precedent.

The Supreme Court has consistently affirmed the deferential standard of review for administrators whose plans assign them discretion, without acknowledging an exception for

---

[4] Even though the court owes no "formal deference" to the Department of Labor's interpretation of Subsection (l), "it is nonetheless entitled to judicial respect, but 'only to the extent that [it has] the 'power to persuade.' *Christensen*, 529 U.S. at 587, 120 S.Ct. 1655 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). . . . Having considered the effect of the November 2000 amendment to [Subsection (l)], the Court is not persuaded that the new version of the regulation requires a rigid rule of de novo review in all cases." *Goldman*, 417 F. Supp. 2d at 804.

[5] This conclusion is consistent with the decisions of other courts in this district. *See H. v. Cigna Behavioral Health*, Case No. 2:17-cv-110-TC, 2018 WL 4082275, at *8 n.3 (D. Utah August 27, 2018) (concluding Cigna had substantially complied with ERISA's procedural regulations and expressly declining to adopt the "stricter test" adopted in *Halo*); *C. v .ValueOptions*, Case No. 1:16-cv-93-DAK, 2017 WL 4564737, at * (D. Utah October 11, 2017) (agreeing with other district courts within the Tenth Circuit "that there is no basis for changing the Tenth Circuit's standard when the Tenth Circuit has not done so" but also concluding that the regulatory violations alleged were "inadvertent and harmless"), *appeal docketed*, No 17-4175 (10th Cir. Nov. 9, 2017).

cases involving procedural irregularities. *James v. Int'l Painters and Allied Trades Indus.*, 738 F.3d 282, 283 (5th Cir. 2013) (per curiam) ("[T]he Supreme Court has never suggested the standard of review applied to ERISA administrators' benefits determinations should change because of procedural irregularity."). The Supreme Court has affirmed that *Firestone* "set out a broad standard of deference without any suggestion that the standard was susceptible to ad hoc exceptions." *Conkright v. Frommert*, 559 U.S. 506, 513 (2010). And it has further stated that "it is not necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon" a single factor. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008). As such, the Supreme Court has reversed decisions from lower courts that created new exceptions to the *Firestone* standard in cases involving "a systemic conflict of interest," *Conkright*, 559 U.S. at 513 (discussing *Metro. Life Ins. Co.*, 554 U.S. 105), and involving "a single honest mistake in plan interpretation," *id.* In *Metropolitan Life Insurance v. Glenn*, the Supreme Court declined to adopt the exception the Sixth Circuit Court of Appeals had applied because "in practice [it] could bring about near universal review by judges de novo . . . of the lion's share of ERISA plan claims denials." 554 U.S. at 116. It concluded that if Congress was inclined to "such a system of review . . . it would not have left to the courts the development of review standards but would have said more on the subject." *Id.*

Nevertheless, the Circuit Courts, including the Tenth Circuit have "carved out exceptions to the general rule" for procedural irregularities. *Id.* at 283. Interpreting *Firestone* alongside the then-applicable regulations, the Tenth Circuit concluded in *Gilbertson* that when a decision is deemed denied for failure to comply with the regulations, the administrator's decision merits no deference unless the administrator had substantially complied with the regulations. 328 F.3d at

632, 634–35. Interpreting *Firestone* in conjunction with the 1977 regulations, the Circuit concluded an administrator whose plan grants it discretion is entitled to deference when it applies its expertise to the review of a claim and is therefore entitled deference only if the administrator actually renders a decision that is "a valid exercise of that discretion." *Id.* at 631. In the context of delinquent decisions, a claim that is deemed denied because the administrator failed to render a decision is denied as a matter of law, not as a matter of the administrator's discretion. *Id.* at 632–33 (quoting *Gritzer v. CBS, Inc.*, 275 F.3d 291, 296 (3rd Cir. 2002) ("'[I]t is the trustee's analysis, not his or her right to use discretion or a mere arbitrary denial, to which a court should defer.'").

But if an administrator with discretion substantially complies with the regulations it is entitled to arbitrary and capricious review despite failing to strictly comply because a "hair-trigger rule" requiring strict compliance "could inhibit collection of useful evidence and create perverse incentives for the parties." 328 F.3d at 634–35. It would "be antithetical to the aims of ERISA. ERISA's procedural regulations are meant to promote accurate, cooperative, and reasonably speedy decision-making, not to generate an endless stream of business for employment lawyers." *Id.* at 635. Therefore, the Tenth Circuit held that so long as "an ongoing, good faith exchange of information between the administrator and claimant" occurs, "inconsequential violations of the deadlines or other procedural irregularities [do] not entitle the claimant to de novo review." *Id.* In sum, the Tenth Circuit will apply arbitrary and capricious review as long as the administrator has engaged the claimant in a "meaningful dialogue." *Id.* Therefore, this court next considers whether Cigna in fact engaged the S Family in a meaningful

exchange regarding its claims or if the alleged procedural irregularities necessitate a more stringent review by this court.

The S Family's claim of procedural irregularities focuses on specific omissions, misstatements, and other communication failures. Efforts to obtain coverage were primarily made by S.S.'s mother, Robin S. First, the S Family asserts Cigna failed to provide access to and copies of relevant documentation upon Robin S.'s request, as the regulations require, *see* 29 C.F.R. § 2560.503-1(j)(3). (Motion 20–21, ECF No. 27.) After Cigna denied the S Family's claim for residential treatment at Solstice, Robin S. wrote Cigna asking for the denial rates of one of Cigna's reviewing physicians, Dr. Qayyum. The S Family claims it was entitled to Dr. Qayyum's denial rates because Cigna relied upon them in the Solstice denial and because the rates would demonstrate Cigna's compliance with the administrative process and regulations. (*Id.*) *See* 29 C.F.R. § 2560.503-1(m)(8). The S Family does not explain how Cigna relied upon Dr. Qayyum's historical record to decide this claim, and the court concludes the rates are not relevant on that basis. The S Family then assumes, without evidence, that denial "at exceptionally high rates" would show that "Cigna was failing to put in place processes and safeguards to ensure that the claim determinations are being made in accordance with the terms of the plan." (Motion 21, ECF No. 27.) But Dr. Qayyum's denial rates would not be proof of noncompliance. Even if the rates suggested a pattern of denial, such a pattern would not exclude the possibility that a review of the relevant medical records would support denials in each case. Without the underlying documents about other patients' health and medical history, to which the S Family is not entitled, the S Family would be reviewing the denial rates in a vacuum and would be unable to draw meaningful conclusions about Cigna's compliance with the regulations

from the denial rates. Thus, the requested documents would be unlikely to provide relevant information and there was no qualifying procedural irregularity or failure to substantially comply.

Second, the S Family argues that Cigna failed to identify which criteria were not met when it denied S.S.'s extended stay at Menninger as not medically necessary and then failed to remedy the omission when Robin S. raised this issue in her appeal of the denial. (Motion 22, ECF No. 45.) In support of this allegation, the S Family cites this court to Robin S.'s letter to MCMC on external review in which she made the same allegations the Family makes here. (Sealed Record 691, 693, & 698.) But Cigna's denial letter contains the information Robin S.'s letter asserts was not provided. It specifies that further acute inpatient treatment was unnecessary because S.S.'s "symptoms were sufficiently stabilized so that [she] could be safely and effectively treated at a less restrictive level of care." (*Id.* at 837.) The letter also addresses S.S.'s progress in treatment and a lack of family participation and ultimately concludes her continued stay at Menninger "was primarily for the purpose of providing a safe and structured environment." (*Id.*) These statements correspond directly with the Plan's Guidelines for determining medical necessity,[6] which define "medical necessity" to mean "health care services that a Provider, exercising prudent clinical judgment, would provide to a patient . . . and that are" among other things "[r]endered in the least intensive setting that is appropriate for the delivery of health care." (*Id.* at 82.) The Guidelines further specify patients are not eligible for continued stay in acute care when their families are not "involved to the best of their ability" or if

---

[6] The S Family concedes that the criteria set forth in the document "Cigna Standards and Guidelines/Medical Necessity Criteria" is a part of the Plan. (Motion 4 ¶ 6, ECF No. 27.)

"continued stay is primarily for the purpose of providing a safe and structured environment." (*Id.* at 84–85.) Therefore, Cigna's letter explaining the Menninger denial directly addresses the criteria its reviewing physician considered in its denial.

The S Family also argues Cigna's denial of coverage for S.S.'s continued stay at Menninger did not satisfy 29 C.F.R. § 2560.503-1(h)(2)(iv), which requires the plan or its administrator to "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information as submitted or considered in the initial benefit determination." The S Family implies through a rhetorical question that Cigna could not have undergone such a review when its denial letter fails to mention the specific arguments and information set forth in her appeal. (Motion 23, ECF No. 27.) But it points the court to no affirmative evidence that Cigna ignored its arguments.

While the court agrees with the S Family that the denial is conclusory, the denial does not on its face betray a failure to provide an adequate review, and it contains a statement that the claimant is entitled to receive "copies of all documents, records, and other [relevant] information." (Sealed Record 839.) Upon making a documents request, the S Family would have received an "Appeals Clinician Case Summary" completed by the reviewing physician. (*Id.* at 192–94.) In the Summary, the reviewing physician, Dr. Blank, included notes on S.S.'s treatment beginning October 9, 2013, and continuing through the denied period. He observed her progress and her parents' involvement in her treatment based on her providers' records. (*Id.*) The court cannot conclude that this constitutes a failure to substantially comply with the requirement to provide a comprehensive review, and the S Family does not specify what precisely Dr. Blank's

review should have done but did not do. Thus, the court finds there were no procedural irregularities in Cigna's denial of coverage for S.S.'s continued stay at Menninger.

Third, the S Family alleges irregularities in the denials of its claim and appeal for coverage of S.S.'s treatment at Solstice. It claims Cigna contradicted its prior statements about S.S.'s eligibility for residential treatment, failed to consider and apply substance abuse criteria, and failed to provide specific reasons for the denial and to address each of the arguments the S Family presented in the appeal. (Motion 23–25, ECF No. 27.) The arguments relating to contradictory statements about residential treatment and the failure to consider substance abuse speak to the merits of the decision; they are not procedural in nature as demonstrated by the lack of citation to a specific regulation that they believe Cigna violated.

The remaining arguments amount to a claim that Cigna failed to engage in the dialogue mandated by the regulations in its review and denial of the Solstice claim and appeal. The initial denial stated multiple reasons for denial that were keyed to the Guidelines' definition of medical necessity for residential treatment. (Sealed Record 652.) Specifically, beginning November 5, 2013, S.S. did not require twenty-four-hour care and could be treated at a less restrictive level of care. Thus, Cigna provided a basis for its denial and provided the notice required under the regulations regarding access to documents, records, and other information supporting the denial. (*Id.* at 653.) Therefore, the initial denial satisfied the regulations. The S Family further complains that Cigna did not address each of the arguments in its appeal. But the regulations do not require a plan or its administrator to answer every question or factual detail the claimant raises.

In sum, the S Family has demonstrated no procedural irregularity that amounts to a failure to substantially comply with the regulations. At each stage of the process, the S Family

received a reasoned statement of the denial accompanied by a statement of the right to receive supporting documents. Other than Dr. Qayyum's denial rates, the S Family points to no instance when a requested document or piece of information was not provided. And it fails to demonstrate how the various short comings violated the regulations. It is apparent that the S Family had an opportunity to participate in a "full and fair review" and that Cigna should not be deprived of deferential review and the appropriate standard in this action is arbitrary and capricious review.

"Under this arbitrary-and-capricious standard, '[the court's] review is limited to determining whether the interpretation of the plan was reasonable and made in good faith.'" *LaAsmar*, 605 F.3d at 796 (quoting *Kellogg v. Metro Life Ins. Co.*, 549 F.3d 818, 825–26 (10th Cir. 2008). "[T]he Court must decide, on the same evidence that was before the administrator, 'whether substantial evidence supported' the denial of coverage. This decision 'need not be the only logical one nor even the best one.'" *Lyn M. v. Premera Blue Cross*, Case No. 2:17-cv-1152, 2018 WL 2336115, at * 3 (D. Utah May 23, 2018) (quoting *Te'O v. Morgan Stanley & Co. Inc.*, 311 Fed. Appx. 165, 169 (10th Cir. 2018) (unpublished)).

## II.     *Merits*

S.S. suffered from depression, anxiety, and ADHD. (Motion 10–11, ECF No. 27.) There is no question that, at the time of her treatment at Menninger and Solstice, S.S. was a young woman in need of psychiatric care. The dispute lies, rather, in the question of medical necessity and whether the care S.S. received at Menninger and Solstice was the level of care covered under the Plan's definition of medical necessity in the context of acute psychiatric inpatient treatment

and residential treatment.[7] (Sealed Record 26.) The parties agree the Plan includes the

Guidelines, which set forth distinct criteria for evaluating admission to and continued care at

acute and residential treatment facilities. (Motion 3–7, ECF No. 27; Response 5–8, ECF No. 30.)

The court addresses the S Family's arguments regarding each facility in turn.

a. *Menninger*

During her stay at Menninger, S.S. received acute psychiatric inpatient treatment. Cigna

deemed her treatment at Menninger from October 2, 2013 to October 10, 2013 medically

necessary and provided coverage as a result. It concluded the remainder of her time was not

medically necessary and denied coverage. According to the Guidelines, continued stay in an

acute psychiatric inpatient facility is medically necessary for children and adolescents if the

following are met:

1. The individual continues to meet all basic elements of medical
   necessity.
2. One or more of the following criteria must be met:
   A. The treatment provided is leading to measurable clinical
      improvements in acute symptoms and a progression towards
      discharge from the present level of care, but the individual is
      not sufficiently stabilized so that he/she can be safely and
      effectively treated as a less restrictive level of care, OR

---

[7] The issue of insurance coverage under the Plan is not the same as whether S.S.'s family
believed she needed care at the level she received. The court notes that the parents in cases like
this one may be motivated to seek out the best, most effective, and most rigorous care they can
for their children. This is in direct contradiction with the Plan's preference for the least restrictive
level of care. *See Carlo B. ex rel. C.B. v. Blue Cross Blue Shield of Massachusetts*, No. 2:08-CV-
0059 BSJ, 2010 WL 1257755, at *4 (D. Utah Mar. 26, 2010) ("The prospect of being more
readily reimbursed for the lesser cost of what likely would be less effective, maybe even
ineffectual treatment options seems to miss the point of a parent seeking mental health care for
an ill child in the first place: to choose the treatment option with the best chance of success.").
The court sympathizes with parents who are put in this position, but it is bound by the terms of
the Plan.

       B.  If the treatment plan implemented is not leading to measurable clinical improvements in acute symptoms and a progression towards discharge from the present level of care, there must be ongoing reassessment and, modification to the treatment plan, when clinically indicated, OR

       C.  The individual has developed new symptoms and/or behaviors that require this intensity of service for safe and effective treatment.

    3.  All of the following must be met:

       A.  The individual and family are involved to the best of their ability in the treatment and discharge planning process.

       B.  Continued stay is not primarily for the purpose of providing a safe and structured environment.

       C.  Continued stay is not primarily due to a lack of external supports.

(Sealed Record 84–85.) Cigna applied this definition in its three denials of coverage for S.S.'s continued stay at Menninger, all of which are based on substantial evidence.

First, Cigna issued a claim determination letter on October 11, 2013, based on a Clinical Case Discussion between Dr. Robert-Ibarra and Cigna's on-staff psychiatrist Dr. Victoria Shampaine on the same date. (*Id.* 1065–67.) Cigna denied coverage because

> [S.S.'s] symptoms d[id] not meet the medical necessity criteria . . . for continued stay from 10/11/2013 as [she was] in good behavioral control and [was] not demonstrating disorganized thoughts or behavior. [She was] not reporting active thought or intent to harm [her]self and [was] not immediate risk for self injury. [Her] struggle with anxiety however [were] not demonstrating psychiatric symptoms or behaviors that require 24 hour a day nursing supervision for safe and effective treatment.

(*Id.* 1066.) Dr. Shampaine reached her conclusion after her discussion with Dr. Robert-Ibarra and reviewing S.S.'s medical records. (Response 9, ECF No. 30.) Her notes state that "Dr. Ivarra [sic] reports that from the insurance point of view she is not SI however by her own report she is constantly SI and hearing voices. Her self report is inconsistent with her presentation." (*Id.* at 216.) Further, "The team feels that therapist boarding school would be appropriate. . . . [S]he is

socializing well and is a positive leader. She talks about her psychosis but can easily move on to talk about her fears about what her parents are doing right now." (*Id.*) Although Dr. Shampaine's notes also indicate that S.S. dealt with anxiety, "maybe early personality disorder," and exposure to problems within the family, the notes provide ample evidence to support the conclusion that S.S. was making progress and no longer required twenty-four-hour care. Dr. Shampaine further concluded that at that time outpatient treatment would be appropriate. (*Id.* 207.)

Second, after the S Family determined to continue S.S.'s treatment at Menninger and pursue an appeal, Cigna denied the appeal on February 20, 2014. (*Id.* 724–726.) The February 20 decision letter was based on Dr. Alvin Blank's review. Dr. Blank concluded that

> [S.S.'s] symptoms were sufficiently stabilized so that [she] could be safely and effectively treated at a less restrictive level of care from 10/11/2013 – 11/01/2013. [She] remained in behavioral control with no serious incidents of self-harm or aggression. [She was] compliant with her treatment plan. Though [she] continued to intermittently report hallucinations, they were non-command in nature and were not noted to the result of psychosis or to cause significant impairment. In addition [her] family was not involved to the best of their ability in the treatment and discharge planning process, as clinically indicated. [Her] stay was primarily for the purpose of providing a safe and structured environment. Appropriate and timely treatment was available at a less restrictive level of care.

(*Id.* at 724.) Dr. Blank's conclusions were based on the S Family's appeal submission and he reached them after completing a summary of the clinical evidence and other evidence on file at the time. (Response 11, ECF No. 30.)

In his summary, which was not initially provided to the S Family but which it could have requested (Sealed Record 726), Dr. Blank noted that as of October 11, 2013, S.S. was "not endorsing the [suicidal ideation] herself" and that the doctor was "questioning voices." (*Id.* at

193.) His summary cites evidence of family support but also facts that suggest the family was not always involved in S.S.'s treatment, including that they traveled to Las Vegas and that the father was absent from the hospital. (*Id.*) He further cites the medical records as supporting S.S.'s social engagement with peers and in activities, the absence of "self harm or aggression," and her denial of psychosis. (*Id.*) The summary indicates that, as of October 11, the Peer Review Treatment and Discharge Plan was to "transfer [S.S] to therapeutic boarding school" and that "[t]here may" have been "a med change to address anxiety however the emphasis of treatment [will] be working with the family to address the communication and support," noting that "[t]he family has not been actively participating in treatment." (*Id.*) From these observations, Dr. Blank reasonably concluded that S.S.'s condition had stabilized and could be managed at a lower level of care and that acute in-patient was no longer warranted because her family was not involved to the best of their ability.

Not satisfied with this result, the S Family appealed, which appeal Cigna denied on May 13, 2014, based on the review of outside reviewer MCMC. (*Id.* at 323–24.) Cigna's letter quoted MCMC's review as stating:

> As of 10/11/2013 there is not a high likelihood that the patient is about to cause serious bodily harm to self or others due to a psychiatric illness; it is not very likely that serious harm will come to the patient due to a psychiatric illness, or that harm cannot be prevented at a lower level of care; the patient does not have a secondary condition such that treatment cannot be provided at a less restrictive level of care, and less restrictive levels of care are available for safe and effective treatment. As such, the requested acute inpatient (IP) stay from 10/11/2013 – 11/01/2013 is not medically necessary.

(*Id.*) MCMC's reviewer, Dr. Susan Rosenfeld, conducted her own review of the Menninger records. (*Id.* at 676–78.) Her record notes show that S.S.'s likelihood of self-harm was

diminished and that any ongoing need for treatment could be met at a less restrictive facility. (*Id.*) As such there was a reasoned basis for her conclusion. Therefore, at each step of the process, Cigna's denial was based on record evidence sufficient to withstand arbitrary and capricious review.

Nevertheless, the S Family argues the denials based on the reviews by Dr. Blank and MCMC are deficient because the reviewers did not consider letters that Dr. Segundo Sergio Robert-Ibarra, S.S.'s treating physician at Menninger, and Dr. Paul G. Pelts, her longtime outpatient treating physician, submitted on her behalf. (Motion 30–34, ECF No. 27; Reply 10–11, ECF No. 34.) The S Family does not argue that these physicians should receive special treatment but that the failure to consider their opinions at all is arbitrary and capricious. (*Id.* 11.) It states that the opinions of these doctors constitutes "unimpeached credible evidence" that the trier of fact cannot ignore. (*Id.* (citing *Gaylor v. John Hancock Mut. Life. Ins.*, 112 F.3d 460, 467–68 (10th Cir. 1997)).

But the S Family has provided no evidence that the Cigna or MCMC reviewers ignored the treating physicians' letters other than that Cigna's denials did not directly address the letters. It is true that Cigna did not refer to these letters directly, but a failure to mention them does not per se indicate a failure to consider them. And this court cannot require the administrator to disclose what weight it gave the treating physicians' letter because the Supreme Court has concluded that courts may not "impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 824 (2003). Further, even though the treating physicians' appeals on behalf of S.S. are compelling, courts have concluded that treating

physicians are not in the best position to evaluate a patient because of the sympathy a treating physician may feel for his or her patient. *See Black & Decker*, 538 U.S. at 832; *Williams v. Metro. Life Ins. Co.*, 459 F. App'x 719, 726 (10th Cir. 2010) (unpublished). Therefore, Cigna's failure to discuss the treating physicians' letters does not make the denial arbitrary and capricious. Because Cigna's denial of the S Family's claim for benefits for S.S.'s treatment at Menninger from October 11 on is based on substantial evidence, the court will not disrupt Cigna's decision.

     *b. Solstice*

     S.S. received residential treatment at Solstice beginning November 6, 2013. (Response 14, ECF No. 30.) Applying the medical necessity Guidelines for residential treatment for children and adolescents, Cigna denied coverage on February 6, 2014 and denied the appeal on January 30, 2015. (Response 15, ECF No. 30.) MCMC, acting as IRO external reviewer, then denied coverage on June 2, 2015. (*Id.* at 17.) According to the Guidelines, residential treatment for children and adolescents is medically necessary if all of the following are met:

    1. All of the basic elements of medical necessity must be met.
    2. One or more of the following criteria must be met:
       A. The child/adolescent has been diagnosed with a severe psychiatric disorder that is pervasive and significantly impairs developmentally appropriate functioning. This impairment in function is seen across multiple settings such as; school, home, work, and in the community, and clearly demonstrates a need for 24-hour supervision and active treatment, OR
       B. Immediate prior treatment in a more intensive level of care (such as a mental health inpatient) has resulted in an acceptable degree of stability. However, the child/adolescent continues to display behaviors that require around-the-clock supervision in a structured setting in order to maintain the safety of the child/adolescent and others.
    3. All of the following criteria must be met:

A. The child/adolescent and/or family demonstrate chronic dysfunction, which is likely to respond to multiple therapeutic and family treatment interventions, and all parties commit to regular treatment participation.

B. The child/adolescent is able to function with age-appropriate independence, participate in structured activities in a group environment, and is capable of developing the skills necessary for functioning outside of the residential program.

C. Less restrictive or intensive levels of treatment are not appropriate to meet the child/adolescent's needs or have been tried and were unsuccessful.

(Sealed Record 89.) Cigna applied this definition to the S Family's claim in denying the claim and upholding it on appeal.

Cigna first denied the S Family's claim for benefits for her time at Solstice in a letter dated February 6, 2014. (*Id.* at 652–54.) The denial was based on the review of Solstice's records by Dr. Mohsin Qayyum. (*Id.* at 652.) Cigna's denial specified

> The clinical basis for this decision is: Based upon the available clinical information, your symptoms did not meet medical necessity criteria of Cigna Level of Care Guidelines for Residential Mental Health Treatment for Children and Adolescents level of care from 11/5/2013 – 07/09/2014. You did not have a severe psychiatric disorder that was pervasive and resulting in significant impairment multiple settings and clearly demonstrates a need for 24-hour supervision and active treatment. Less restrictive or intensive levels of treatment were appropriate and available.

(*Id.*) Dr. Qayyum reached this conclusion after he reviewed the clinical records. (*Id.* at 197–99.) His notes acknowledge S.S. was somewhat resistant but also that she was "cooperative" and actively seeking to establish "coping skills" through "guitar." (*Id.* at 197.) Although his notes do not provide detailed history or analysis, they are consistent with the observations of two subsequent reviewers and the court's review of the Solstice medical records.

The S Family appealed the denial, and Cigna denied that appeal on March 5, 2015, based on Dr. Frederick Green's review. (*Id.* at 474–77.) Dr. Green concluded that

> [S.S.] did not continue to display behaviors that required around-the-clock supervision in a structured setting in order to maintain the safety of [her]self or others. The information provided was that [she] engaged well in therapy and showed an understanding of the concepts. As the notation was that after more than 6 months, the facility considered it to be an 'early discharge,' clearly there was a long-term stay in a stable living situation being considered as a major component of the stay. In the absence of a focused new intervention proposed that required around-the-clock supervision, there is nothing suggesting that while living in a supportive setting [she] could not use outpatient psychotherapy appropriate. Less restrictive or intensive levels of treatment were appropriate and available.

(*Id.* at 474–75.) Dr. Green's notes summarizing the Solstice records indicate that S.S. could receive the necessary care in an outpatient setting. (*Id.* at 184.) He noted that S.S. had been a "star patient" at Menninger, where she had done "great work . . . with zero behavioral problems" and that she was "moderately cooperative" upon her arrival at Solstice, including "interact[ing] well" with her mother. (*Id.* at 184–85.) Over the course of her several months' stay at Solstice, records showed she was "engaged," "increasingly grounded," "responsive," "very open/collaborative," and "appreciat[ive of] parents involvement." (*Id.* at 184–85.) The records also show that she was at times "tentative w/ peers," "mildly defensive," and "mildly disengaged" (*id.*), but such observations do not negate the positive behavior. Dr. Green explained his denial decision by saying S.S. "d[id] not continue to display behaviors that required around-the-clock supervision in a structured setting in order to maintain the safety or [her]self or others. . . . [She] engaged well in therapy and showed an understanding of the concepts." (*Id.* at

186.) He believed she could succeed in an outpatient setting. (*Id.*) His conclusions are reasoned and based on the medical records he reviewed.

Not satisfied with this outcome, the S Family again sought IRO review, and its claim was again assigned to MCMC. MCMC's anonymous board-certified reviewer provided a "Clinical summary" and extensive review of the records that referenced eighteen different psychiatric sources in reaching its conclusion. (*Id.* at 278–84.) After noting the S Family's concern with S.S.'s "dual diagnosis issues" and a review of the "[p]rogram notes," the reviewer stated that the treatment S.S. was receiving at Solstice was not medically necessary because it was not "in accordance with generally accepted standards of medical or dental practice" and was not "clinically appropriate" because a less restrictive environment was available. (*Id.* at 279–82.) The reviewer also noted that S.S.'s diagnosis included "chronic self loathing/self injury," which "is largely an outpatient treatment condition utilizing individual and group therapy for dialectical behavioral therapy along with medication management." (*Id.* at 282.) The reviewer further noted that there were community options for drug and family related needs. (*Id.*) The reviewer then cited eighteen sources related to childhood trauma, residential treatment for adolescents with mental illness, substance abuse treatment, childhood anxiety disorders, and adolescent depression. (*Id.* at 282–84.) The reviewer's conclusion reflects her review of the program notes and was supported by many studies. Thus, the reviewer reached a reasoned conclusion based on substantial evidence, so the decision was not arbitrary and capricious.

The S Family's primary remaining arguments that Cigna improperly concluded residential treatment was not medically necessary are that Cigna had previously recommended residential treatment and that its reviewers failed to apply medical necessity criteria for drug

abuse. (Motion 38, ECF No. 27.) But Cigna did not represent that residential treatment was medically necessary in its denial of coverage for Menninger. Dr. Shampaine's notes, which Dr. Blank also referenced, reflect that at the time of the interview with Dr. Robert-Ibarra, discharge to therapeutic boarding school was the contemplated next step. But those notes are dated October 13, 2013, approximately three weeks before S.S. left Menninger. (Sealed Record 215–16.) As such, they have little bearing on what was medically necessary in the first week of November. And no Cigna denial letter stated residential treatment was appropriate. They state only that S.S. could be treated at a lower level of care. The S Family's dual diagnosis argument is similarly misguided. Each reviewing physician referenced Solstice's conclusion that she dealt with alcohol and drug abuse and documented her consumption and goals. And as Cigna points out, coverage upon admission to residential treatment for substance abuse under the Guidelines is only available if the patient has a "documented diagnosis of a moderate-to-severe substance use disorder." (Response 35, ECF No. 30; Sealed Record 121.) These arguments do not change the fact that the record includes evidence supporting the conclusion that S.S. could have been treated at a less restrictive level of care, making residential treatment not medically necessary.

### III.    Fees and Interest

Finally, the S Family contends it is entitled to an award of prejudgment interest. (Motion 39, ECF No. 27.) The court concludes this issue was prematurely raised and declines to consider it.

**CONCLUSION**

The court's review is limited to asking whether Cigna's determinations were arbitrary and capricious. And because the court concludes substantial evidence supports Cigna's conclusions, it must affirm Cigna's denials of coverage for S.S.'s treatment.

DATED this 3rd day of December, 2018.

BY THE COURT:

Clark Waddoups
United States District Judge